Leo G. WETHERILL, Plaintiff–
Appellant,

v.

Granville E. HUNT and Teresa Hunt,
Defendants–Respondents.

No. WD 44354.

Missouri Court of Appeals,
Western District.

Dec. 24, 1991.

Motion for Rehearing and/or Transfer to Supreme Court Denied Jan. 28, 1992.

Application for Transfer Sustained
Feb. 25, 1992.

Case Retransferred June 2, 1992.

Court of Appeals Opinion Readopted
June 5, 1992.

G. Spencer Miller, Kansas City, for plaintiff-appellant.

Frederick Gregg Thompson, IV, Kansas City, for defendants-respondents.

Before LOWENSTEIN, C.J., and TURNAGE and SPINDEN, JJ.

**LOWENSTEIN, Chief Judge.**

Appellant Leo Wetherill filed a suit for compensatory damages and punitive damages against Granville and Teresa Hunt, contending that in a previous suit between the parties, the Hunts had maliciously prosecuted a counterclaim against Wetherill. A jury found in favor of Wetherill on the malicious prosecution claim, awarding him $7,611.46 in compensatory damages and no punitive damages. Wetherill appealed, arguing that the trial court abused its discretion in limiting closing arguments to 15 minutes, that the amount of damages was unsupported by the evidence, and that the punitive damages instruction was erroneous. The Hunts appealed as well, maintaining that Wetherill had not made a submissible case on civil malicious prosecution.

*The facts underlying the appeal*

Wetherill bought two adjacent lots in 1955, built his home on one, and sold the downhill lot to the Hunts in 1962. Wetherill reserved a 12 foot easement running along the property line in order to maintain a retaining wall. The Hunts completed their home in 1965, and the neighbors lived without incident until 1983. Throughout that time, the natural flow of water runoff was across Wetherill's lot and on to the Hunts' lot. In 1983, Wetherill began a two year project to restructure his front yard. He brought in 67 cubic feet of dirt, added a brick patio and sidewalk, a brick courtyard with walkways and walls surrounding it, widened his driveway, and extended a drainage pipe to within three feet of the Hunts' property. During 1985, the Hunts began to believe that these changes to the Wetherill lot had so increased the water runoff onto their property that erosion, cracks in the front stoop and walkway, and cracks in their basement had resulted. In August of 1985, the Hunts therefore placed railroad ties along the easement between the two lots, and so redirected runoff back onto Wetherill's lot, which pooled in a sunken backyard patio, and caused damage to Wetherill's basement.

**201**

During the placement of the tie wall, Wetherill had the lots surveyed, confirming the wall's encroachment on the easement. When Wetherill informed Mr. Hunt that he did not want the tie wall on the easement, Mr. Hunt told Wetherill he could "go to hell," and to "take the easement and stuff it up his ass." Mr. Hunt denies this statement, yet at least two other angry confrontations occurred between the previously amiable neighbors. After the tie wall was in place, Mr. Hunt confronted Wetherill and his attorney in the front yard. Mr. Hunt told the two that he did not want to deal with any attorneys, and the entire problem was going to be "settled" between him and Wetherill right there.

Wetherill filed suit against the Hunts for trespass and nuisance in early September, 1985. He believed throughout that the erosion damage to the Hunt lot was from their own downspout, and so during a hard rain one day, went out to photograph pools of water in their yard. Mr. Hunt ran out of his home and called Wetherill a "bastard," "son-of-a-bitch," and said he would "kill" Wetherill. Mr. Hunt admitted to the use of the word "bastard."

The Hunts were represented by counsel in the initial suit, Mr. John Biersmith, who sent an engineer out to make a report on the condition of the two lots. After Beirsmith was killed in an auto accident, attorneys Ted Barnes and John Russell took over the case, and subsequently recommended and filed a counterclaim against Wetherill for damage to the Hunts' yard, walk, and basement. The damages alleged in the counterclaim were $75,000 compensatory, and $100,000 punitive. Wetherill successfully defended the counterclaim in the initial suit. Evidence revealed that the majority of the cracks in the Hunts' basement had occurred prior to the Wetherill yard project, as indicated by paint in the cracks. Wetherill also showed by expert testimony that 38 percent less runoff came from his property than before the project. Wetherill received a $3,700 judgement against the Hunts, which they paid.

In November of 1987, Wetherill filed his second suit against the Hunts, alleging malicious prosecution of the counterclaim, and claiming $50,000 compensatory, and $250,000 punitive damages. The Hunts subsequently moved from their home in February of 1988. At trial of the malicious prosecution case in October, 1990, the Hunts testified that they had relied on advice of counsel in filing the 1986 counterclaim, the report of their engineer, and finally their belief that the problems in their yard and home had been caused by Wetherill's project. The Hunts' son testified to seeing erosion in the yard, stating that dirt had washed onto decorative rocks along the Hunts' home. Numerous photographs were entered into evidence by both sides, which reflect some degree of washing in the Hunts' lawn.

Wetherill's evidence for malicious prosecution was that the cracks had occurred prior to his project. He called an engineer, who testified that the Hunts' post-landscaping cracks were probably caused by a soil condition at the footing level of the Hunts' home, not by surface water. Wetherill also introduced testimony that soil settling around the Hunts' home changed the water runoff patterns in their own yard, which were later remedied before the Hunts sold their home. The Hunts' attorney, Barnes, testified that although he had recommended the filing of the counterclaim, he had not known that many of the cracks had existed prior to the Wetherill yard changes. Attorney Russell's deposition mirrored Barnes' trial testimony. Wetherill again presented evidence that his project had decreased the water runoff to the Hunts' lot by 38 percent. Further, Wetherill presented a great deal of testimony as to Mr. Hunt's displays of anger and hostility during the entire episode.

Although Wetherill's attorney fees for the initial suit were not split between the claim and counterclaim, an attorney in the initial suit, David Nachman, did so later by reviewing billing statements for the attorneys involved, and using his judgment of the case to divide the time. Nachman's testimony at trial was that Wetherill's attorney fees attributable to the counterclaim equaled $11,417.19. The bulk of the $50,000 claim for compensatory damages was

apparently imputed to Wetherill's loss of income in time spent defending the counterclaim.

## The points on appeal

That both parties have appealed, that there has been two trials, extensive legal fees and bad blood for eight years underscores how far out of control this situation has gotten. If there is any good news from this unseemly neighbors' dispute, it is that the legal system has kept citizens from resorting to physical violence as a method of solving interpersonal disputes. The bad news is the court time and the legal expense invested in prolonging the acrimony between these people. If ever there were a set of facts which called for alternative dispute resolution, it is those in this appeal, the points of which are now addressed.

◼ Each side was given fifteen minutes for closing argument. Wetherill claims this was an abuse of discretion since he needed more time to explain the complexities of the suit to the jury. The trial court is vested with discretion in determining the length of time for closing argument, and such decision will not be disturbed absent a clear abuse, *Bussell v. Leat*, 781 S.W.2d 97, 103–04 (Mo.App.1989); *Henderson v. Jackson*, 526 S.W.2d 73, 74 (Mo.App.1975). Wetherill asserts that, given the difficulties of the distinctions between the degrees of malice needed to show actual versus punitive damages, the fifteen minute limit resulted in his not getting all of his prayed-for actuals and none of his punitive damages. Other than this assertion, he makes no showing of what he was unable to argue or its significance, a fatal deficiency as pointed out in *Steenrod v. Klipsch Hauling Company, Inc.*, 789 S.W.2d 158, 170 (Mo.App.1990). The length of trial, complexity of issues, and the competence and experience of trial counsel did not call for a larger time allotted for argument, *Henderson v. Jackson*, 526 S.W.2d 73, 74–5 (Mo.App.1975).

◼ Wetherill next cites error in the trial court's failure to grant him a new trial on the issue of damages. Without supporting authority, he points to the fact that his out-of-pocket attorney fees were $11,471.19 and the verdict was for $7,611.46. In this trial, Wetherill had an attorney, as an expert, reconstruct and reallocate the prior legal fees based on the attorney's knowledge of Wetherill's petition and his defense of the Hunts' counterclaim. The jury was not bound to believe that the fees attributable to the counterclaim were $11,471.19. There was substantial evidence for the verdict. This point is denied out of hand.

◼ Wetherill's last point concerns instructional error. Reduced to a nutshell, he states that the court should have tendered instructions defining malice based on *Burnett v. Griffith*, 769 S.W.2d 780 (Mo. banc 1989), rather than ones based on *Proctor v. Stevens Employment Services, Inc.*, 712 S.W.2d 684 (Mo. banc 1986). Overlooking preservation and presentation problems under Rule 84.04(e), suffice it to say that *Proctor* controls. *Proctor*, as does this case, dealt with "the degree[s] of malice required in a civil malicious prosecution action," *id.* at 686. *Proctor* held that malice in law was required in a civil malicious prosecution suit, and this is defined as a "wrongful act done intentionally without just cause or excuse," *id.* at 686 (quoting from *Sanders v. Daniel International Corp.*, 682 S.W.2d 803, 807–8 (Mo. banc 1984)). As to the degree required for a punitive submission, the *Proctor* court said legal malice ("any improper motive") was required, which demands "proof of a mental state" and "proceedings ... continued primarily for a purpose other than that of securing the proper adjudication of the claim on which they are based," *Proctor* at 686–7. On the other hand, *Burnett v. Griffith*, 769 S.W.2d 780, 788 (Mo. banc 1989), dealt with punitive damage instructions arising out of malicious prosecution suits in the context of the intentional tort of assault and battery. *See e.g., Perry v. Dayton Hudson*, 789 S.W.2d 837 (Mo.App. 1990). The point is denied.

◼ The Hunts cross-appealed. Their only point is that Wetherill failed to make a

submissible case on malicious prosecution. The elements of this cause are:

(1) the commencement of a prosecution against the plaintiff; (2) instigated by the defendant; (3) termination in favor of the plaintiff; (4) want of probable cause for the prosecution; (5) defendant's conduct was actuated by malice, and; (6) plaintiff was damaged. *Sanders v. Daniel International Corp.*, 682 S.W.2d 803, 807 (Mo. banc 1984).

In particular, the Hunts contend there was a failure of evidence to show the counterclaim was without probable cause or actuated by malice. A review of the evidence and inferences most favorable to Wetherill, *Interstate Petroleum v. F & B Investments*, 816 S.W.2d 263, 267 (Mo.App.1991), show little likelihood of the Hunts' proving the counterclaim pleaded amount of $75,-000, or any amount of damage to their property. Cracks in their basement existed years before Wetherill's construction. An engineer testified that the soil around their home had settled years prior to the action, and was the probable cause of increased erosion. There was also evidence that the overall flow of surface water from Wetherill's property was actually decreased by Wetherill's construction. The fact that water had caused mud to form on decorative rocks in the Hunts' yard would account for only a minimal amount of damage. Under these facts, viewed most favorably to Wetherill, a jury could find a lack of probable cause. In addition, it seems fairly clear that the Hunts were in the wrong to place the railroad tie wall within the easement area, and that such action did cause some damage to Wetherill's home. There was also evidence that the Hunts offered conflicting information to their attorneys during the course of the initial action regarding the basement cracks, yard erosion, and the Hunts' own behavior. Finally, there is weighty evidence pointing to the anger, ill will, and irrational conduct exhibited by Mr. Hunt throughout the disagreement over water runoff and the subsequent suit. Examples of such conduct are Mr. Hunt's desire for a physical confrontation, name-calling, Mr. Hunt's angry and violent reaction to Wetherill's request to avoid the easement, and the belief expressed by Mr. Hunt in deposition that Wetherill was "a terrorist" and engaged in "terrorist acts" by diverting water. These facts support a submission on the grounds of malice in law, "a wrongful act done intentionally and without just cause or excuse," *Proctor v. Stevens Employment Services, Inc.*, 712 S.W.2d 684 (Mo. banc 1986), so that a jury could find malice in law existed.

■ Although a defense would be available to the Hunts because they filed the counterclaim on the advice of counsel, there must be a showing that the client has made a full and truthful disclosure of all material facts to the attorney, *Zahorsky v. Griffin*, 690 S.W.2d 144, 152 (Mo.App. 1985). Both the attorneys for the Hunts testified that the Hunts did not disclose that much of their damage (i.e., cracks in the basement walls) existed for years prior to the filing of the counterclaim.

Even with the evidence reviewed favorably to Wetherill, it is a close case as to his making a claim for malicious prosecution, but that submission will not be set aside. The judgment is affirmed. Costs divided equally.